IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCH OF

APPLE IPHONE IMEI: 3507381432071803
AND
DELL INSPIRON LAPTOP S/N: G0LHQT2

CURRENTLY LOCATED AT 1648
MCGRATHIANA PKWY, SUITE 250,
LEXINGTON, KENTUCKY

Case No. 5:23-MJ-5075-MAS

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION UNDER RULE 41 FOR A
SEARCH AND SEIZURE WARRANT**

I, Chelsea Holliday, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT
BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for search warrants authorizing the examination of property—two

electronic devices—which are currently and lawfully in law enforcement possession, and the

extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been

employed in this capacity since 2018. I am currently assigned to the Louisville Division of the FBI

and have primary investigative responsibility for white collar crimes and public corruption

violations. I am trained and authorized to investigate the offenses alleged herein.  Moreover, I am

a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C.

§§ 1343, 1344, 1349,1028(A) and 1956, and I am authorized by the Attorney General to request a search and seizure warrant. Before becoming a Special Agent, I was employed as a Field Training Officer, Deputy Sheriff, and Investigative Agent by the Brevard County Sheriff's Office in Florida. I have experience investigating public corruption and fraud violations and have been involved with investigations in which the subjects that committed public corruption and financial fraud violations were successfully prosecuted. As a federal law enforcement officer, I am authorized to execute search and seizure warrants issued under Rule 41 of the Federal Rules of Criminal Procedure.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     I am familiar with the investigation described below. I have probable cause to believe that a search of the property which is the subject of this affidavit will reveal evidence of violations of 18 U.S.C. §§ 1343, 1344, 1349, 1028(A) and 1956 (the "Subject Offenses").

**Identification of Property to be Searched**

5.     The property to be searched (the "Subject Devices") is

    a.   APPLE IPHONE IMEI: 3507381432071803

    b.   DELL INSPIRON LAPTOP S/N: G0LHQT2

The Subject Devices are currently located in the FBI Lexington Resident Agency, 1648 McGrathiana Pkwy, Suite 250, Lexington, Kentucky.

6.     The applied-for warrants would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.      The United States government is investigating a conspiracy, including SHIMEA MARET MCDONALD (hereafter "McDonald") and NANA KWABENA AMUAH (hereafter "AMUAH"), the members of which are suspected of committing violations of 18 U.S.C. §§ 1349 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire fraud and bank fraud), 1028(A) (aggravated identity theft), and 1956 (money laundering and conspiracy to commit money laundering).  On January 19, 2023, a federal Grand Jury sitting in the Eastern District of Kentucky indicted McDonald for one count of bank fraud, one count of conspiracy to commit money laundering, and three counts of aggravated identity theft, for the criminal conduct described herein. On February 1, 2023, federal agents arrested AMUAH, while he was attempting to cross the border into Canada, on an arrest warrant issued after a Complaint was filed based on the conduct described herein. On February 16, 2023, a federal Grand Jury superseded the McDonald indictment to add AMUAH to the money laundering conspiracy count.

8.      On August 10, 2022, an official who works for the Lexington Fayette County Urban Government (herein after, "the City of Lexington" or "the City"), received an email from someone whom he believed to be affiliated with a known nonprofit organization, the Community Action Council (hereafter "CAC"). A subsequent email on August 12, 2022, requested that the City official change the bank account information used for sending government funds to the nonprofit organization. The City official who received the email, believing it to be legitimate, forwarded the email to the City's finance department, which changed CAC's banking information to a new account with Truist Bank, as requested.

9.      After the bank account information was changed, subsequent wires were sent by the City to CAC's purportedly new (fraudulent) account with Truist Bank, with an account number

ending in 0109. From August 19 through August 24, 2022, a total of $3,905,837.05 was wired by the City to Truist Bank account *0109. On August 25, 2022, the City of Lexington realized it was the victim of a business email compromise (BEC) scam and reported it to their bank and law enforcement.

10.     Records obtained via legal process from Truist Bank showed the subject/recipient bank account *0109 was opened in the name of Gretson Company LLC, by K.N., with a listed address in Houston, Texas. A check of a database housing operator's licenses revealed that K.N. was a Hispanic female with a Florida driver's license and a home address in Fort Myers, Florida.

11.     In October 2022, K.N. was interviewed by the FBI in Florida. She stated she did not have an account with Truist Bank and did not give anyone permission to use her identity to open accounts with any banks.

12.     Truist Bank provided the FBI with video surveillance showing a black female opened account *0109 on June 6, 2022, under the name Gretson Company LLC, using the identity of K.N. The account was opened at the Old Spanish Trail branch of Truist Bank, branch number 8721407, located at 6118B Scott St, Houston, TX 77021. A review of Truist Bank records received through legal process showed that other in-person banking on account *0109 occurred on July 6, 2022, for the purchase of two counter checks, and on August 17, 2022, for the purchase of 8 counter checks.

13.     A surveillance photo of the black female who opened the subject Truist Bank account *0109 under the name K.N. was obtained from Truist Bank. The photo below depicts a black female with a shoulder tattoo, directly after opening the fraudulent Truist Bank account *0109 under the name Gretson Company LLC on June 6, 2022, using the identity of K.N., and holding items in her hands, including what appears to be an identification card and paper

documents:



14.    According to records obtained from Bank of America through legal process, an account ending in 8059, in the name of Gretson Company LLC, was also opened by a K.N. on June 7, 2022. According to statements for account *8059, in-person banking appears to have occurred on June 22, 2022, July 1, 2022, July 5, 2022, July 6, 2022, August 15, 2022, and August 19, 2022. The following image captured from surveillance video provided by Bank of America in response to legal process shows the same black female, who matches the individual who opened Truist Bank account *0109:



The same tattoo appears near the woman's left shoulder.

15.     On August 17, 2022, at the behest of this individual identifying herself as K.N., Truist Bank printed and provided the individual with eight (8) counter checks that, when filled out and deposited, would be funded by the funds stolen from the City.  On August 19, 2022, one of these checks was attempted to be deposited by an individual purporting to be K.N. in Bank of America account *8059.  Several other checks were attempted to be deposited at other financial institutions.  Ultimately, Truist Bank refused to honor these checks and was able to return all of the City's funds that were sent to the Truist Bank account *0109 pursuant to the BEC scam. The below bank surveillance photos depict the same black female who fraudulently opened Truist Bank account *0109, in Truist Bank on August 17, 2022, obtaining the above-mentioned checks:





The photos above depict the black female first on her cellular device, and then presenting what appears to be an identification card to Truist Bank officials.

16.     The FBI identified McDonald as the woman in the video surveillance and the individual who impersonated K.N. to open the previously mentioned accounts, in the following manner: According to records obtained from Truist Bank, online banking activity associated with account number *0109 originated from Internet Protocol (IP) address 73.136.144.119 on 25 occasions during the period June 24, 2022, through August 24, 2022. According to open-source records, the service provider for IP address 73.136.144.119 is Comcast Cable Communications. According to records obtained by the FBI from Comcast Cable Communications through legal process, the subscriber assigned IP address 73.136.144.119 during this period was:

Name:  Shimea McDonald
Address:  1414 Wood Hollow Dr, Apt 522 Houston, TX 77057
Telephone #: (210) 776-0583
Account:  Ending in 0052

17. Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment and cellular devices were used to interact with the City of Lexington and the fraudulent bank account at Truist Bank used in the bank fraud, money laundering, and aggravated identity theft scheme. McDonald has been observed on bank surveillance using cell phones as she conducts financial transactions on the fraudulent bank accounts. Below is a photo showing McDonald holding what appears to be two cell phones in Bank of America, on August 15, 2022, while conducting a transaction on an account in K.N.'s name:



Furthermore, below is a photo of McDonald actively using a cell phone while in Bank of America on August 19, 2022, conducting a transaction on an account in K.N.'s name:



18.     On January 27, 2023, the FBI executed a search warrant and arrested Shimea McDonald in Houston, Texas. During a post-Miranda interview of McDonald, she advised the following in summation to the FBI: McDonald was working for a Ghanaian man named NANA KWABENAH AMUAH (hereafter "AMUAH"). McDonald met AMUAH at a strip club in Miami, Florida several years ago. AMUAH asked her to work for him, indicating she could make a lot of money in so doing. She agreed and returned to Houston. Later, AMUAH left Florida and moved to Houston. From there, AMUAH provided McDonald with fake identities. He then asked her to form businesses with the Secretary of State of Texas, open bank accounts, and conduct transactions. At all times, McDonald claimed AMUAH gave her all necessary instructions – names of businesses, bank account locations, amounts of transactions, etc.

19.     According to McDonald, AMUAH gave her a cell phone to communicate with him. She said she only used this cell phone to communicate with AMUAH. She gave consent for the FBI to search this phone, a black iPhone, and identified AMUAH as the name, "Stack Up," in her contacts on Telegram. A review of the Telegram conversation between McDonald and AMUAH revealed years of communications about fraudulent activity. Of particular note, investigators located an image on McDonald's black iPhone of the following screen shot, which shows

transactions related to funds wired by the City to the Truist account:



20.     On August 23, 2022, McDonald notified AMUAH that the City's money had been

returned. This is an image of the conversation:



21.    The Telegram communications reviewed on McDonald's cell phone indicate that many more victims had fallen prey to the wire fraud and money laundering scheme of which McDonald and AMUAH were both integral parts. McDonald stated that she knew of at least two others AMUAH recruited in Houston to work in a similar capacity to McDonald. McDonald stated that whenever AMUAH spoke with others, likely about this scheme, he spoke in a different language, so she could not understand the contents of the conversation. In one particular Telegram

conversation, AMUAH stated he was "texting" with a third party regarding financial transactions, as shown below:



22.     McDonald stated that AMUAH paid her with CashApp and Zelle wire transactions, as well as in cash. According to records obtained from Block via legal process, McDonald had CashApp transactions with an account in the name of AMUAH. According to records from Early Warning Services, McDonald also received funds from AMUAH through Zelle.

23.     In a subsequent interview with McDonald, she provided additional details of her interactions with AMUAH. McDonald advised she was hired by AMUAH to help transfer money from one business account to another. AMUAH told McDonald they moved their money in

"discreet ways." McDonald communicated with AMUAH about money transfers via SMS texting, Telegram chats, voice messages, phone calls, and in person. McDonald had received two phones from AMUAH to be used for money transfer activity. The first one was a pink iPhone and the second one was a black iPhone (the phone located by the FBI in McDonald's apartment). McDonald indicated AMUAH was constantly changing his phone number.

24.     AMUAH would provide McDonald with instructions on what to do each time money came into one of the accounts that McDonald opened for AMUAH.  She was instructed to move money either through check withdrawal and deposit into a different account, or through cash withdraw and bulk cash, which McDonald would deliver directly to AMUAH. AMUAH would tell McDonald how much money she could withdraw and/or how much money to obtain checks for. AMUAH would typically communicate this information to McDonald via phone calls and chat messages. AMUAH would frequently have McDonald log into online banking for the accounts and send him screenshots of the account balances via WhatsApp and Telegram messaging applications.  The following screenshots of Telegram messages between McDonald and AMUAH are representative of this activity:





25.     In addition to money transfers, McDonald advised AMUAH also hired her to form "LLCs" and open business bank accounts for him to launder money through. AMUAH provided McDonald with the first LLC that McDonald ever used for money transfers; McDonald believed it was named Palmer Company LLC, because the identity of a woman named A. Palmer was used to form the LLC and open the business bank account. Upon research of the Texas Secretary of State's website and a review of bank records, it was confirmed that a company named Xandria Palm Company LLC was seemingly formed by an individual named A. Palmer; however, the PNC Bank account McDonald opened using this identity was closed and McDonald was not informed as to why the account was closed. When McDonald told AMUAH about this, he told her they

probably closed it because she was not A. Palmer and that next time she goes to the bank, she should wear a mask and sunglasses.

26.      According to McDonald, she witnessed AMUAH using his laptop a few times during the beginning of the scheme, when they had face-to-face contact.  During those times, AMUAH would take his laptop out to his balcony in Miami to do work, but on at least one occasion, he showed her how to fill out forms on his laptop.

27.      When AMUAH instructed McDonald to open shell companies online, which required the use of an electronic device, AMUAH made up the names of all the companies. The business name would usually have part of the identity theft victim's name included within it. For instance, AMUAH named one business "Chitt Media LLC," because the identity used to form the LLC was H. Chitterling. Eventually, McDonald began forming the companies for the accounts AMUAH requested herself, using her laptop to create these companies using the Texas Secretary of State website.  The following Telegram message shows screenshots from the Chitt Media LLC account:



At the direction of AMUAH, she also established Gmail accounts in the names of the businesses under which she was opening companies. The following is a screenshot from McDonald's black iPhone phone showing two such Gmail accounts:



28.     On January 27, 2023, the FBI located 20 identification cards in McDonald's residence during the search warrant execution. The identification cards were in the identities of all different people; however, they each had a photo of what appeared to be McDonald on them. McDonald told the FBI she obtained these identification cards from AMUAH. The FBI researched the identities on the identification cards and confirmed the personal identifying information of at least 18 individuals who lived in the United States was contained on the identification cards. AMUAH also provided McDonald with fake bank cards in the names of identity theft victims, which McDonald would have to use as her "second form of ID" when she opened bank accounts in the identities of other people at the direction of AMUAH.

29.     I know, based on my training and experience, that fake bank cards and identification cards are often ordered from listings on the darknet or manufactured by individuals using specialized printers, all of which requires access to and use of an electronic device like a cellular phone or laptop.  Oftentimes, the fake bank cards are loaded with funds through the use of a magnetic strip reader attached to a laptop.

30.     At least one allegation has been lodged against AMUAH in another district. According to that complaint from 2022, a person close to AMUAH stated he was laundering money in Fort Lee, New Jersey, working with a crew of approximately five people. The complainant further alleged that AMUAH was providing fake documentation and traveling to banks in Ohio to open up fake business accounts with the documents provided. Finally, the complainant alleged AMUAH was dealing with a third-party in Ghana, and his banking transactions were intentionally kept under $10,000 to circumvent banking reporting requirements.

31.     According to a Form 8300 filed with the Secretary of the Treasury, AMUAH described himself as a musician.  On March 23, 2022, he paid $16,658 in cash to Richemont North America, Inc, dba Cartier, a retailer of luxury goods and watches.  Currency Transaction Reports also indicate that AMUAH had bank accounts at multiple institutions and that AMUAH frequently deals in large sums of cash.  He deposited $10,020 in cash into a bank account at TD Bank on August 23, 2021; $18,000 in cash on September 22, 2021, and then $12,000 in cash on October 12, 2021, into a JP Morgan Chase Bank account in the name of Yensil Freights & Logistics, LLC in Fort Lee, New Jersey; and $10,710 in cash into a TD Bank account on April 4, 2022. Additionally, another individual working on behalf of AMUAH, deposited $10,629 in cash to TD Bank, on June 1, 2021. According to TD Bank, AMUAH describes himself as an EMT/Paramedic; and according to Chase Bank, AMUAH described his occupation/type of business as H&M

Hennes and Mauritz AB, a popular multinational clothing company.  For the TD Bank account, AMUAH registered his account email addresses AMUAH20144@gmail.com and nana.amuah104@gmail.com. He registered these same email addresses with an account set up at Wells Fargo.  I know, based on my training and experience, that financial institutions often send correspondence related to bank accounts to the email address registered to that account.  This correspondence includes communications about account set up, account maintenance, marketing materials, and confirmations of certain events.

32.     AMUAH made the JP Morgan Chase deposit into an account in the name of Yensil Freights and Logistics, but when asked for his email address in order to prepare the Currency Transaction Report, AMUAH provided JP Morgan Chase with the email address, donflex104@yahoo.com.  That AMUAH gave this as his email address to the bank, and the common usage of the "104" in the email name suggests that AMUAH has several email addresses he uses to support his banking activity.  Records provided by Yahoo for donflex104@yahoo.com provided under lawful process demonstrate that the recovery email address was amuah20144@gmail.com  There is thus probable cause to believe that these email accounts will contain evidence of the offenses described herein.

33.     The Devices are currently in the lawful possession of the FBI.  They came into the FBI's possession in the following way: On January 27, 2023, a warrant for the arrest of AMUAH for conspiracies to commit wire fraud and money laundering, was signed by the Honorable United States Magistrate Judge Edward B. Atkins, Eastern District of Kentucky. On February 1, 2023, AMUAH was arrested by U.S. Customs and Border Protection officers as he tried to travel to Canada via an Amtrak train. AMUAH was arrested with five bags of luggage and over $10,000 cash. Also among AMUAH's belongings, was an Apple iPhone and a laptop (the Subject Devices).

AMUAH's belongings were seized by CBP pursuant to his arrest and were transferred into the custody of FBI Buffalo.  Therefore, while the FBI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

34.     On February 28, 2023, the Subject Devices were transferred to the FBI Lexington Resident Agency.  The Subject Devices are further described as:

    a.   GREY APPLE IPHONE IMEI: 3507381432071803

    b.   BLACK DELL INSPIRON LAPTOP S/N: G0LHQT2

At all times since his arrest on February 1, 2023, the Subject Devices have been in the custody and control of law enforcement.  Upon arrest, AMUAH's Apple iPhone was placed into airplane mode and his laptop remained powered off. In my training and experience, I know that the Subject Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Devices first came into the possession of the FBI.  The Subjects Devices are currently in storage at 1648 McGrathiana Pkwy, Lexington, Kentucky.

35.     After his arrest, AMUAH gave a post-Miranda statement to the FBI. He confirmed the cell phone he was in possession of belonged to him. He also advised this was his first time taking the Amtrak to Canada. AMUAH stated he was traveling to Canada to attend a party and he was then going to travel to Ghana. This was only five days after McDonald's arrest.  AMUAH denied being involved in financial crimes but confirmed he knew McDonald and other suspected money mules.

36.     In my training and experience working complex financial crimes, individuals who

participate in illicit money-laundering schemes such as this one, commonly communicate using cellular devices before, during, and after their illicit activities. My experience investigating this type of crime has shown that this constant communication is crucial to the success of money laundering schemes; communication via cellular devices ensures the money launderer knows the source of the fraudulent funds, the timing of funds being received, and the amount of funds being received into a particular financial account. Without this information, via some kind of communication (typically cellular device communication), money launderers would be unable to complete their assigned tasks. Furthermore, in my experience, money launderers and their co-conspirators commonly communicate via text, phone calls, and encrypted applications such as WhatsApp and Viber, to make it harder for law enforcement to identify them. These means of communication are typically accessed on cellular devices.

37.     This application seeks review of location history stored on the Subject Devices. Location history helps provide insight into the location of the owner/controller of an electronic device at a particular time.  In this case, the investigative team has obtained IP addresses related to the victimization of the City of Lexington.  Additionally, other business email compromise victims have been identified, and the investigative team is working to obtain records associated with those frauds, including IP address records. While some of the IP addresses obtained in the course of investigating the victimization of the City of Lexington appear to come from virtual private networks, others resolve to actual IP addresses in geographic locations outside the United States.  AMUAH's physical location is material to determining what role he played in this offense. Additionally, elements of the Subject Offenses require wires to travel in interstate commerce, and funds to flow in such a way as to affect interstate commerce or cross national borders.  Learning AMUAH's location when he committed the crimes described herein is material to establishing the

elements of these offenses.

## TECHNICAL TERMS

38.     Based on my training and experience, I use the following technical term to convey the following meaning:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include

various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna

can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

39.     Based on my training, experience, and research, I know that the Subject iPhone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  I know the Subject Laptop has capabilities that allow it to serve as an internet-based telephone, digital camera, portable media player, GPS navigation device, and PDA.   In my training, experience, and research, it is expected that the Device will contain storage devices such as a hard drive and physical memory that will contain data relevant to this investigation.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

40.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

41.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.

Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

42.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that

this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to encode payment card information to the magnetic strip of another card through the use of an encoder like the one mentioned above, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

43. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41I(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to

human inspection in order to determine whether it is evidence described by the warrant.

44.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

45.     I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Chelsea Holliday

Chelsea Holliday
Special Agent
Federal Bureau of Investigation

Transmitted by email and attested to by telephone in accordance with Fed. R. Crim. P. 4.1 on this 15 day of ___March____, 2023.

HON. MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE